CARRIE W. JAQUES, complainant,

*v.*

FREDERICK M. HUNT, defendant.

[Decided May 9th, 1932.]

*Messrs. Lindabury, Depue & Faulks,* for the complainant.

*Mr. Merritt Lane,* for the defendant.

BACKES, V. C.

The bill is by the sister of the defendant to compel the defendant to execute to her a mortgage on the defendant's garage property on Washington street, Newark, according to his promise. The cause was tried with the case of *Williams A. Hunt* v. *Frederick M. Hunt, 10 N. J. Mis. R. 675,* just decided, and the history leading to the promise now sought to be enforced is told there. Blanchard Company, the builder of the garage, filed a mechanics' lien claim for the balance due on its contract and for extras, and recovered a judgment for the debt and costs of $10,720.62. The judgment was against Williams A. Hunt, who then held the title. To save the property from sale, Mrs. Jaques bought the judgment, and it was assigned to her December 1st, 1914. This was in the period when Fred was in the toils of bankruptcy. When Fred concluded to pay his debts and settle the controversy with his trustee in bankruptcy, it was stipulated that Mrs. Jaques should subordinate the judgment to a mortgage to be given by Williams to the trustee, to secure the settlement, and in the agreement as finally executed, to which she was a party, whereby the trustee was to convey the garage property to Fred and he was to execute the mortgage, she stipulated to subordinate the judgment. The solicitor of the trustee insisted upon a cancellation and she canceled, but first obtained an agreement in writing from Fred that he would give her a mortgage to secure the judgment debt. Fred obtained title

to the garage in 1919, after he had paid his debts, but failed to give the mortgage. By his answer he sets up that Mrs. Jaques paid the Blanchard Company but $6,520.62 and that he furnished the rest, $4,200, and by counter-claim he charges her with rent for the Hunt homestead, 519 Washington street, Newark, at $50 a month from 1908 to 1915 and from thence to 1925 at $100 a month, a total far in excess of the judgment debt. Mrs. Jaques says she advanced $8,500 towards the purchase of the judgment; $5,500 from her own bank accounts, and $3,000 drawn from her mother's estate of which she was administratrix and which, she says, she had in cash at home, having drawn it from the bank shortly before, and that Fred gave her $1,500; that she paid in all $10,000. Both witnesses are self-confessed perjurers, they having sworn falsely in previous suits, Mrs. Jaques, that she paid rent to one Brown, to whom Fred had conveyed the homestead to hide it from his creditors, and the unsupported affirmations of either will not be accepted as sufficient to sustain the claims against the other. Mrs. Jaques' bank books show that she drew $5,500 when she bought the judgment, and as to the $3,000 from her mother's estate, it is in evidence that Fred compelled her to account for it in the orphans court. The story that she had the sum in cash in the house is suspicious, and if she had, that it was used to purchase the judgment, we have but her word, as we have only Fred's word that he advanced $4,200. Neither statement is reliable and we must look elsewhere for a decision. The judgment is conclusive evidence of the debt and, in the agreement to give the mortgage, Fred acknowledged that he owed Mrs. Jaques the full amount of the judgment. The burden is on him to show that he reduced it, and in that he has failed. It is held that he owes Mrs. Jaques $8,500, with interest.

The counter-claim for rent is not made out. The homestead was bought by Fred in 1905. His mother then ran the home and Fred, Williams and Mrs. Jaques and her young daughter lived with her. When she died in 1908, Mrs. Jaques took up the holsehold cares and Fred and Williams continued on until Fred married in 1925. She kept house for them,

they paying her $5 apiece board, later $6, and then $8. Fred's claim that Mrs. Jaques agreed to pay him $50 a month rent in addition to paying the household expenses, and having the labors of the household, on an income from him and Williams of approximately $45 a month seems incredible. She never paid him rent and he never asked for any until the bill was filed, and good reason appears: When the house was purchased for $6,500, Williams and Mrs. Jaques each advanced $2,000. Williams was never repaid. Fred says he repaid Mrs. Jaques, which she denies. Some, if not all, the taxes, water rents, insurance and repairs were paid out of the funds of Hunt Brothers of which Fred and Williams were partners. And there are these refuting circumstances: why did Fred pay board weekly if rent was to be paid monthly; and why, if approximately $4,500 was due in 1915 when Fred acknowledges he owes Mrs. Jaques the amount of the Blanchard Company judgment and promised her a mortgage to secure the debt if she would cancel the judgment, was not this large accumulation adjusted and set off at least mentioned? We feel that the counter-claim is an emergency offset, that it is unfounded, and it will not be allowed.

Two technical defenses are offered; unclean hands and laches. Mrs. Jaques gave false testimony in another suit concerning a matter wholly unconnected with the purchase of the Blanchard judgment and Fred's agreement to secure her by mortgage upon cancellation of the judgment; and it occurred more than two years before. *Neubeck* v. *Neubeck, 94 N. J. Eq. 167; 119 Atl. Rep. 26.* It is also claimed that Mrs. Jaques committed perjury in the pending litigation and relief should be denied on the authority of *Clickner* v. *Clickner, 95 N. J. Eq. 479; 123 Atl. Rep. 373.* The testimony characterized as perjury was unrelated to the contract which the complainant seeks to enforce; it had to do with the occasion when Mrs. Jaques signed the settlement agreement, two or three weeks before she canceled her judgment upon Fred's promise to give her the mortgage, and, if untrue in fact, as to which we are not persuaded, it was due to mistaken recollection.

Laches is not shown. Fred paid up his debts and came into the title to the garage, and was in position to give the mortgage in 1919. Mrs. Jaques first knew of it in 1922. Importuned, Fred put her off. It must be remembered that they were of the same household, and resort to suit would have caused a family disruption. While technically the suit is for specific performance, the rule of promptitude or an explanation of the delay, exacted as the price for specific performance of contracts for the sale of land, does not obtain. In such actions the parties are left to their remedy at law for damages; here there is no remedy but in equity.

A decree for complainants will be advised.